UNITED STATES of America,
Plaintiff-Appellee,

v.

Christ BAMBULAS, Defendant-Appellant.

No. 71–1922.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 18, 1972.

Decided Dec. 22, 1972.

Rehearing Denied Jan. 22, 1973.

———◆———

Robert S. Bailey, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Chicago, Ill., Ronald G. Scheraga, Appellate Division, U. S. Department of Justice, Washington, D. C., for plaintiff-appellee.

Before DUFFY, Senior Circuit Judge, KILEY, Circuit Judge, and GRANT,* Senior District Judge.

DUFFY, Senior Circuit Judge.

Defendant Bambulas, one Charles Russell and two unindicted co-conspirators, Fortner and Taylor, were named in a three-count indictment charging them with having transported, or caused to be transported, stolen United States Savings Bonds in interstate commerce and publishing them as true at various banks in Wisconsin and Texas for the purpose of defrauding the United States in violation of 18 U.S.C. § 2314. Conspiracy under the substantive offense was charged in Count I of the indictment. Counts II and III charged respectively the interstate transportation of stolen bonds from Chicago to Eau Claire and Green Bay, Wisconsin, and to Fort Worth and Houston, Texas.

After protracted deliberation, the jury returned a verdict of finding Bambulas guilty on all three counts. Defendant Bambulas appeals.

Co-defendant Russell pleaded guilty prior to trial and testified for the government. He was sentenced for the same term as was defendant Bambulas, concurrent five year terms of imprisonment on each count subject to parole.

Russell stated at trial that he and Courtney Taylor were arrested on a charge of transporting stolen securities, convicted of that offense and sentenced to imprisonment in April 1964. Russell testified that he had been acquainted with defendant Bambulas prior to the 1964 arrest and had instructed Bambulas to obtain stolen government savings bonds while he, Russell, was in prison in order to have them ready for conversion to cash after his release from prison.

Russell was released from prison in July, 1967. He contacted defendant Bambulas who told Russell he had accumulated $100,000 worth of stolen savings bonds. Following his release, Russell attested to various conversations with Bambulas with respect to the stolen bonds and stated that Bambulas exhibited the bonds to him in the kitchen of Bambulas' home. After counting and sorting the bonds, the two discussed an appropriate cut for each after the bonds had been passed. They agreed, however, to wait until the two passers arrived whom Taylor had recruited in prison.[1] However, the latter two refused to participate in the scheme. Russell then sent word to Taylor in prison to recruit and train another passer, which he did, in the person of Fortner.

Defendant Bambulas told Russell the bonds were not to be cashed in Illinois and determined that the first set of bonds would be passed in Wisconsin.

Taylor sent Lee Fortner, the recently released inmate, to Chicago after training him in prison as a "passer". He arrived on January 30, 1968. Russell told Fortner they would be cashing the bonds in Eau Claire and Green Bay, Wisconsin and that defendant Bambulas would finance the first operation. Later, Bam-

---

* Senior District Judge Robert A. Grant of the Northern District of Indiana is sitting by designation.

1. Courtney Taylor remained in prison until January 1968, but was instructed by Bambulas and Russell to contact inmates, who upon release, would work as passers of the bonds in perpetration of the scheme.

bulas gave Russell the sum of $150 for expense purposes.

According to the testimony, Russell and Fortner then left Chicago for Green Bay where they rented an apartment and opened savings accounts in five or six banks in the name of "Frank Scarpino". The following day they drove to Eau Claire where a similar procedure was followed. After receiving an additional $100 from defendant Bambulas, they again visited Green Bay and Eau Claire and made small deposits in each bank account.

After laying the groundwork for the scheme, Russell and Fortner returned to Chicago. Defendant Bambulas and Russell carefully sorted the stolen bonds retained by Bambulas in substantially equal groups and each group was placed in an envelope with the pass book for the savings account at a particular bank.

Russell and Fortner then returned to Wisconsin with the bonds. Fortner entered each bank with forged identifications and negotiated the bonds. After each transaction (except for the last transaction in each city where the inculpatory evidence was destroyed in their automobile), Fortner would meet Russell at a nearby tavern where Russell collected the proceeds and destroyed the passbooks. After cashing all the Scarpino bonds, Fortner and Russell returned to Chicago where they divided the proceeds totaling approximately $24,000 among themselves, defendant Bambulas and Taylor. Twenty-five percent of the proceeds were paid to defendant Bambulas together with funds sufficient to cover his costs in obtaining the bonds.

After returning to Chicago, Russell told Bambulas that he would be ready to cash the balance of the bonds within a week or ten days, that he had decided to negotiate the bonds in Texas. Bambulas delivered the balance of the bonds to Russell. They followed the procedure previously used in Wisconsin by first renting rooms and opening a series of savings accounts in Fort Worth and Houston banks (In the names of "Rau-wolf", "Dzwigon", and "Talty"). They later returned, made small deposits in each bank and finally cashed in the bonds. Approximately $26,000 in bonds were cashed in Texas. In all, twenty-one banks were victimized.

Lee Fortner corroborated Russell's testimony in substantial part also testifying as a government witness. Fortner added that Taylor had informed him while still in prison of Bambulas' role as supplier of stolen savings bonds. In addition, while Bambulas attempted to remain unidentified to Fortner, Fortner explained that he had followed Russell to Bambulas' place of employment where he observed Russell and Bambulas, the alleged supplier.

Taylor testified for the defense alleging he had no knowledge of Bambulas' role in the scheme. Defendant Bambulas also took the stand and testified he was innocent; that Taylor and Russell were known to him only as customers at the Chicago tavern where he was employed.

Defendant raises three issues on appeal.

(I) He challenges the failure of the trial judge to permit defendant's reputation witnesses to testify whether they would believe defendant Bambulas under oath;

(II) He questions the sufficiency of the charge of the District Court to the jury on the issue of credibility;

(III) He challenges a supplemental "Allen-type" charge given to the jury during their deliberation.

### I.

Five witnesses were called to attest to defendant's reputation in the community. Defense counsel, after ascertaining from one such witness, Mrs. McChrystal, that defendant's reputation for telling the truth was "very good", asked her: "Mrs. McChrystal, would you believe Christ Bambulas under oath?" The government objected, although not be-

fore the witness had answered in the affirmative. The Court sustained the objection, instructed the jury to disregard the answer and admonished defense counsel for asking the question and precluded him from asking this question of the remaining reputation witnesses.

Each of the five reputation witnesses whom defendant called was asked if he knew the appellant's general reputation in the community for honesty, integrity and truthfulness. Each replied that he did and that defendant's reputation was very good.

Defense counsel now argues on appeal that the District Court erred in precluding the question concerning the credibility of the defendant under oath to be posed to each reputation witness.

Historically courts in the various jurisdictions have not decided on a settled rule when considering the admissibility of the question propounded to a witness, "Would you believe the person (party or other witness) under oath?" This controversy has evolved from the dichotomy of common law views on character and reputation testimony. Under English common law such a question was perfectly accepted, deeming as admissible the personal belief of a witness. This tendency later had to be reconciled with the notion that community reputation was the essential source of proof.

Various jurisdictions have adopted solutions to this question of admissibility which range from the extreme that such a question should be summarily excluded as inconsistent with the principle that reputation is the sole source, to the extreme that the personal belief of the witness is admissible and the question proper.

Federal courts, as well as state courts, have also been in great conflict when faced with the admissibility of this question. In Held v. United States, 260 F. 932 (5 Cir., 1919), the Fifth Circuit allowed the question, "From your knowledge of [his] general reputation for truth and veracity, would you believe him on oath?". Whereas our Circuit, seven years later, sustained an objection to a similar question in Colbeck v. United States, 10 F.2d 401 (7 Cir., 1926). Yet, in the latest federal determination of this question, United States v. Walker, 313 F.2d 236 (6 Cir., 1963), a case relied upon by the defendant herein, testimony in response to a similar question after the bad reputation of the witness had been established to the effect that the impeached witness could not be believed under oath, was ruled admissible. Significant in the latter two cases is the fact that the question was posed to impeachment witnesses attesting to the bad reputation of the impeached. Whereas, in the case at bar, the question was to be asked of reputation witnesses testifying to Bambulas' good reputation.

Wigmore in Vol. VII, Wigmore on Evidence, 3rd Ed., § 1985 notes the inconsistency in holding that evidence with respect to a witness' character is restricted to evidence of general reputation while an impeaching witness is allowed to give his individual opinion with respect to the truthfulness of a witness (be it a party or other) under oath.

■ We believe a solution to this controversy can be realized by allowing a question after the introduction of reputation evidence to the effect, "Knowing his reputation (in the community), would you believe him on oath?". In this manner the two extremes of common law views are reconciled to the extent that an expression of personal belief is utilized as a mode of measuring the reputation of the witness in question, thereby expressing the sentiment of the community on such a question to a jury.

In the case at bar, each of the five reputation witnesses, although not allowed to answer the general question whether Bambulas was to be believed under oath, in concert, did attest to his good reputation for honesty, integrity and truthfulness in the community. Furthermore, before the Court instructed the jury to disregard Mrs. McChrystal's answer to defense counsel's

question, her answer had been enunciated in the presence of the jury.

We are of the opinion that although the question was precluded in the case at bar, the defendant was not prejudiced by its exclusion by the District Court when considering the testimony which was allowed. If the Court was in error by excluding the question, we conclude from the facts previously related, that such error was harmless beyond a reasonable doubt. Schneble v. State of Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

## II.

On appeal, defense counsel raises a twofold argument in alleging the jury instructions given by the District Court were insufficient; that the charge with respect to promise of immunity or hope of reward to the government witnesses was not explicit or substantial, and that the judge did not use an instruction detailing impeachment of witnesses by previous felony convictions which resulted in prejudice to the defendant.

From the testimony at trial and the sentences imposed on Bambulas and Russell, there is no indication that immunity or a promise of leniency had been offered by federal authorities to Russell. In addition, Fortner testified that federal agents had emphatically stated to him that there would be "no deals" as reward for his testimony. Furthermore, the defense failed to introduce any evidence to warrant an instruction on promised immunity or leniency to their witnesses.

It should be noted the trial judge, after defining the term "accomplice" to the jury and naming Russell as an example, instructed the jury to receive unsupported evidence by an accomplice with caution, adding, "You should not convict the defendant upon the unsupported evidence of an accomplice, unless you are satisfied that that unsupported evidence establishes his guilt beyond a reasonable doubt".

Defendant's second alleged insufficiency of jury instructions charges that the jury should have been completely apprised of previous felony convictions of the government witnesses. Evident from the record in the general charge by the District Judge to the jury is his reference to impeachment of a witness by evidence showing that he had been convicted of a felony. From their testimony at trial, the fact that Russell and Fortner had been previously convicted as felons was already before the jury. Therefore, we are convinced from the record that the District Court's general instruction on credibility to the jury was sufficient, the proof of prior convictions of the government witnesses was before the jury; thus the necessity for separate instructions upon a showing of prior convictions was thereby obviated. Ruvel v. United States, 12 F.2d 264 (7 Cir., 1926).

For the reasons hereinbefore discussed, we hold the jury instructions were sufficient and non-prejudicial to the defense.

## III.

The final issue argued by the defendant on appeal involves a supplemental "Allen-type" or "dynamite" charge given to the jury upon their request by the District Judge after substantial deliberation.[2]

After the trial judge had given the original charge to the jury, they deliberated for more than three hours whereupon they were dismissed for the night without returning a verdict. The following morning they continued deliberation for two and one-half more hours at which time the judge received a communique from the jury foreman desiring audience with the judge. The foreman indicated to the judge when the jury

---

2. Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

was convened that the jury "could not agree".

Prior to the jury being convened, the District Court informed defense counsel that he intended to give the jury a supplemental charge if warranted by the circumstances delineating the duties of each juror, in accordance with the Seventh Circuit guidelines for such a charge indicated in United States v. Brown, 411 F.2d 930 (7 Cir., 1969), adopting the substance of the American Bar Association guidelines for a supplemental charge.[3] Defense counsel objected to such a charge being given. The charge was nonetheless given and the jury renewed their deliberation. Four hours later they reached a verdict of guilty.

On appeal, defendant apparently does not find the contents of the charge repugnant and for good reason. The supplemental charge discarded the coercive, Allen type language and substituted a charge we believe consonant with the recommended standards.[4] Notwithstanding the wording of the instruction, defendant argues the timing of the charge was objectionable when it was evident there was a minority to coerce. Furthermore, defendant argues that because the instruction was given without the concurrence or at the request of either party, such action by the Court in hearing a jury request was improper.

■ There is no evidence of jury coercion by the District Court in convening the jury after their lengthy deliberation at their own request. The instructions were nonprejudicial and did not incorporate any Allen-type admonitions invading the province of the jury as condemned in United States v. Thomas, 146 U.S.App.D.C. 101, 449 F.2d 1177 (1971). An additional fact attesting to the noncoercive nature of the charge is that the jury resumed deliberations for four additional hours.

We hold the supplemental charge to the jury at their request was proper and well within the perimeters of Brown, supra.

Affirmed.

---

3. American Bar Association Project on Minimum Standards For Criminal Justice, Trial By Jury 146–56 (Approved Draft, 1968) (Section 5.4).

4. The instruction given by the District Court follows: "You know, as I told you in my instructions, that the verdict has to be a unanimous verdict if you are going to return it, whatever it is, guilty or not guilty. The twelve of you have to agree as to what it is or else you don't reach a verdict.
   In that process you have a duty to consult with each other as objectively, and as rationally, as logically as you can with a view of reaching an agreement if it can be done, without any member of the jury doing violence to his own individual judgment. Each of you has to decide the case for himself, but in that process you have an obligation to listen carefully and to consider impartially and fairly, the evidence as it is analyzed by all of the jurors.
   I know it sometimes happens in deliberations, that people get into a position and they become more advocates than judges. Your responsibility is, as is mine in cases, is not to take the position of representa-

tion of any party, but a position of evaluation objectively of the evidence.
   In the course of your deliberations you should never hesitate to reexamine your own views and change your opinion if you are convinced it is erroneous. That is your job. In that process, of course, you should not surrender your honest convictions as to the weight of the evidence or to the effect which the evidence has, solely because some other juror may have a different opinion, or for the mere purpose of arriving at a unanimous verdict. But, I was hopeful that this morning after a night's sleep, whatever tensions or emotions had arisen, you might more objectively, more impartially, arrive at a unanimous verdict. If you can do that without any juror doing violence to his own convictions about what the evidence shows, then that is your duty to do it.
   I would hope that with these few observations, perhaps you could go back and reexamine, each of you, whatever your position, each of you, all of the evidence as it relates to each of the counts and see whether you can come to a unanimous verdict."