**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Sam De STEFANO and Edward Speice,**
**Defendants-Appellants.**

**Nos. 72-1407, 72-1408.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 4, 1972.

Decided Feb. 12, 1973.

Amended Order April 20, 1973.

James B. Martin, Peter W. Boznos, Melvin B. Lewis, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Gordon B. Nash, Jr., William T. Huyck, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.

CASTLE, Senior Circuit Judge.

Appellants Sam De Stefano and Edward Speice were convicted by a jury verdict rendered on March 16, 1972 of endeavoring to induce a prospective witness not to testify in a pending federal case, in violation of 18 U.S.C. § 1503 (1970). On this appeal, defendants have raised many objections to the propriety of the proceedings in the district court. Their major objections are that: 1) the indictment was insufficient to charge a violation of 18 U.S.C. § 1503, 2) the district judge deprived the defendants of their constitutional rights to confront witnesses against them and to due process of law by his refusal to subpoena the witness whom the defendants allegedly threatened, and 3) the district judge erred in giving what the defendants characterize as an "expanded *Allen-Brown* 'dynamite charge'." Our consideration of these and other arguments raised by both defendants convinces us that the conviction of appellant De Stefano should be affirmed, and the conviction of appellant Speice should be reversed and remanded for a new trial.

The trial of the defendants commenced on March 9, 1972. The first government witness was James P. Braseth, a group supervisor of the Federal Bureau of Narcotics and Dangerous Drugs. Mr. Braseth testified that on February 22, 1972 he had one Charles Crimaldi in his protective custody and was escorting him into the Dirksen Federal Building in Chicago to testify in the trial of Anthony Esposito, who was charged with illegally transferring cocaine to Crimaldi. Braseth testified that he and Crimaldi entered an elevator in the federal building and punched the control button thereon for the 18th floor. The elevator proceeded to the second floor, where its doors opened. Just as the doors were about to close, defendant Speice stuck his arm between them, causing them to reopen automatically. After glancing inside the elevator, Speice called to someone who was apparently in the corridor: "Hurry up. Look

who's here." Then defendant De Stefano appeared, and both he and Speice entered the elevator together with two men whom Braseth did not recognize. De Stefano stood directly in front of and face to face with Crimaldi, and Speice stood within two feet of De Stefano, also facing Crimaldi. Looking at Crimaldi, De Stefano said to him: "My eyes are dimming, but I think I know you. My memory is fading, too. It must be old age." Then, coming closer to Crimaldi, pointing his finger and gritting his teeth, De Stefano declared in a loud, angry voice: "I understand your eyes are failing—are dimming, and your memory fading permanently this week." Braseth observed spittle on De Stefano's mouth as he voiced these words, and noticed that De Stefano emphasized the words "your" and "permanently" by raising his voice and smashing his fist into his hand. At that point defendant Speice looked at Crimaldi and stated: "Have you done any fishing lately?" Crimaldi made no response to the remarks of either defendant, but with his face flushed, he trembled as he listened.

Braseth also testified that from his knowledge, acquired while posing as an undercover agent, the phrase "Have you done any fishing lately?" was a means of intimating that the person addressed would shortly end up as fish bait, his body cut up into small pieces and dumped into a convenient body of water.

Defendant Speice testified that he went to the federal building on February 22, 1972 at the request of De Stefano, who needed a driver to take him to confer with people who were involved in trials there. Speice and De Stefano then went to the second floor cafeteria, where De Stefano, in mistakenly thinking that a patron there was someone he knew, apologized with a statement that he supposedly made quite regularly:

"My eyes are dimming and my memory is fading." After leaving the cafeteria, Speice approached the closing doors of the elevator and caused them to reopen. Saying nothing, he and De Stefano entered. At this point he saw Charles Crimaldi, whom he hadn't seen for years and who now "looked like he was about to die" because he was shaking and had a flushed face. Looking at Crimaldi, De Stefano made his "usual statement": "Evidently you must know me. My eyes are dimming . . . ." Speice did not recall hearing De Stefano predict that Crimaldi's memory or eyes would fade.[1] Realizing the tension in the elevator and thinking that Agent Braseth was going for his gun, Speice then tried to calm the atmosphere by innocently asking Michael Polesti, who had also gotten on the elevator on the second floor: "Have you done any fishing lately?" Speice also testified that Braseth and Crimaldi got off at the 18th floor, and that after he and De Stefano got off on the 21st floor, De Stefano asked him whether he had seen the "nut" on the elevator and speculated that that person must have jumped one of De Stefano's bonds [2] or owed him money. When Speice told him that the nervous person was actually Chuck Crimaldi, De Stefano did not believe him at first, but then decided to go back to the 18th floor and to attempt to talk to Crimaldi. They were unsuccessful in this attempt.

Appellant De Stefano did not testify under oath.

## I. Sufficiency of the Indictment

The grand jury returned the following indictment against the defendants:

That on or about February 22, 1972, at Chicago, Illinois, in the Northern District of Illinois, Eastern Division, Sam De Stefano and Edward Speice, defendants herein, did knowingly, willfully and corruptly endeavor to in-

---

1. On cross-examination Speice modified his testimony by saying he "thought" he heard De Stefano say: "My eyes are fading" but wasn't sure. But when cross-examined by De Stefano, Speice flatly denied that he heard De Stefano say anything about his eyes fading.

2. De Stefano's wife was apparently in the bail bond business.

fluence, obstruct, and impede the due administration of justice in that on or about the date aforesaid the defendants did corruptly and by threat of force endeavor to induce a prospective witness, Charles Crimaldi, not to testify in the case of United States of America vs. Anthony Esposito, 71 CR 980, which was set for trial on that date in the United States District Court, Northern District of Illinois, Eastern Division;

In violation of Title 18, United States Code, Section 1503.

Defendant De Stefano seeks to invoke the holding of Pettibone v. United States, 148 U.S. 197, 13 S.Ct. 542, 37 L. Ed. 419 (1893), to prove that this indictment fails to state a violation of 18 U.S.C. § 1503. That eighty-year-old decision stated that, in order to allege the crime of intimidating a witness, the indictment must charge that the defendant a) knew that the person he threatened was a witness and b) had knowledge or notice that the witness was to testify in a proceeding pending in a federal court.

■ We find that the indictment returned by the grand jury against the defendants was sufficient. The allegations contained therein are certainly more detailed than those of the indictment returned against the defendant in *Pettibone*.[3] The indictment charges that the defendants acted "knowingly" in violation of 18 U.S.C. § 1503; this allegation of knowledge encompasses the required *mens rea* for the crime. *See* United States v. Zolli, 51 F.R.D. 522, 526 (E.D.N.Y.1970). It also sets out "facts that show knowledge or notice," United States v. Pettibone, 148 U.S. at 206, 13 S.Ct. at 546, that Crimaldi was a witness in a pending proceeding. Anderson v. United States, 215 F.2d 84, 89 (6th Cir.), cert. denied, 348 U.S. 888, 75 S.Ct. 208, 99 L.Ed. 698 (1954).

It is also doubtful whether the common law devotion to legal formalities which fathered the *Pettibone* decision should govern us today. The Supreme Court has clearly stated that the "old common law rules of criminal pleading" have yielded to the modern practice of disregarding formal defects in indictments. Hagner v. United States, 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861 (1932). Instead, the important function of a present-day indictment is to apprise the defendant of the nature of the offense with which he is charged, and to make an adequate record so that the defendant can plead any conviction or acquittal resulting from the indictment as a bar to future prosecutions. United States v. Debrow, 346 U.S. 374, 376, 74 S.Ct. 113, 98 L.Ed. 92 (1953), Hagner v. United States, *supra,* United States v. Henderson, 471 F.2d 204 at 205 (7th Cir. 1972); Fed.R.Crim.P. 7(c). In accord with this contemporary view of pleading, decisions dealing with 18 U.S. C. § 1503 have held that an indictment worded merely in the language of that statute is sufficient, United States v. Bell, 351 F.2d 868, 874 (6th Cir. 1965), cert. denied, 383 U.S. 947, 86 S.Ct. 1200, 16 L.Ed.2d 210 (1966), Holland v. United States, 245 F.2d 341, 342 (5th Cir. 1957), even though the indictment contains no express allegations that the defendant knew that the person he threatened was a potential witness in a pending criminal proceeding. Seawright v. United States, 224 F.2d 482, 483 (6th Cir.), cert. denied, 350 U.S. 838, 76 S.Ct. 76, 100 L.Ed. 748 (1955), Parsons v. United States, 189 F.2d 252, 253 (5th Cir. 1951), United States v. Zolli, 51 F. R.D. 522 (E.D.N.Y.1970). Defendant has suggested no reasons to depart from the holdings of these decisions. Nor has he provided any persuasive reasons why this court should add to the necessary elements for charging a violation of 18

---

3. The *Pettibone* indictment charged that the defendants conspired "to corruptly and by force and threats obstruct and impede the due administration of justice" and, thereafter, in pursuance of the conspiracy did "obstruct and impede the due administration of justice . . . . " The indictment contained no allegation that the defendants acted knowingly; nor did it name the witnesses who were threatened or the court proceeding involved.

U.S.C. § 1503 by requiring that the indictment state the words of threat and the persons to whom the threats were uttered. Defendant De Stefano's reliance upon cases involving threats to the life of the President of the United States and refusal to answer questions posed by the House Un-American Activities Committee involve different statutes, factual situations and first amendment policy considerations which make their holdings inapposite to the instant case.

## II. Failure of the District Court to Subpoena Crimaldi as a Witness

The defendants argue on appeal that the district court erred in refusing to order Charles Crimaldi to testify at their trial, either as a court or defense witness. They contend that Crimaldi's testimony would throw light on such questions as what occurred in the elevator on February 22, 1972, and what the words "Done any fishing lately?" actually mean in both common and underworld parlance.

The record reveals that when Speice and De Stefano learned that the government did not plan to produce Charles Crimaldi to testify about the threats made to him in the elevator, they sought to have him subpoenaed as a court or defense witness. At first, government agents intimated that they did not know where Crimaldi was; later they admitted knowing his whereabouts, but reported that Crimaldi had insisted that he could not testify against his former juice-racket employer De Stefano because of his deathly fear that De Stefano would cause him harm. The agents did, however, arrange for Speice's attorney to talk to Crimaldi by telephone.[4] The person at the other end of the line who identified himself as Crimaldi stated that he was afraid of coming to Chicago to testify because he did not believe that the government could protect him. If the government could not prevent John and Robert Kennedy from being killed, he reasoned, it could not ensure his safety either.

At the outset, we note that the question of whether a witness can or must be produced to testify at trial implicates two constitutional considerations. The first allows a defendant to secure the appearance of certain witnesses that can provide relevant and helpful evidence for his defense; it is based both on the sixth amendment right of the accused "to have compulsory process for obtaining witnesses in his favor" and on the "fundamental requirement of fairness" for criminal trials inherent in the due process clause of the fifth amendment. Roviaro v. United States, 353 U.S. 53, 60, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). The second constitutional consideration precludes the use of testimony against a defendant without affording him the opportunity to cross-examine the person testifying, when the evidence adds substantial and even critical weight to the case against the accused; this safeguard is based upon the sixth amendment right of confrontation. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Both these considerations are involved in the instant case: the first is implicated in the case against De Stefano, the second in the case against Speice.

### a) Right to Secure Witnesses.

Defendant De Stefano argues that his right to compulsory process meant that Crimaldi's fears of retaliation could not excuse his refusal to appear, the government's failure to disclose his whereabouts during trial, or the district court's denial of all motions to subpoena him. He submits that the right to demand the production of witnesses is vested in a defendant without qualification.

As both sides admit, there are few, if any, cases bearing on the question of whether the government must produce a witness who refuses to testify because

---

4. De Stefano refused to participate in the telephone conversation.

he is allegedly fearing for his life. The proper resolution of this issue, we believe, is to consider first whether the government was constitutionally required to produce Crimaldi; only then is it necessary to decide whether Crimaldi's expressions of fear relieved the government of this obligation.

■ A court violates an accused person's rights to compulsory process and to fundamental fairness at his trial when it denies him the ability "to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." Washington v. Texas, 388 U.S. 14, 23, 87 S.Ct. 1920, 1925, 18 L.Ed.2d 1019 (1967), Roviaro v. United States, 353 U.S. at 63–64, 77 S.Ct. 623. United States v. Seeger, 180 F.Supp. 467, 468 (S.D.N.Y.1960). Unless the witness denied to the defendant could have produced relevant and material testimony for his defense, there is no constitutional violation.

■ Although there is some controversy as to the allocation and substance of the burden of proof for showing the materiality of a witness' testimony (see, e. g., the majority and dissenting opinions in United States v. Skeens, 145 U. S.App.D.C. 404, 449 F.2d 1066 (1971)), the record in the instant case contains no factual indication that Crimaldi's testimony would help defendant De Stefano. The record reveals only the sworn testimony of Agent Braseth that he had repeatedly tried to convince Crimaldi to testify, but that Crimaldi had continually refused. Defendant De Stefano has raised only intriguing speculations as to what Crimaldi might testify to. He suggests that Crimaldi might testify that he was not physically displaying fear in the elevator; but such testimony is quite unlikely, since both defendant Speice and De Stefano himself (although not under oath[5]) testified that Crimaldi appeared frightened. He also suggests that Crimaldi might testify that it was De Stefano's mere presence —and not his words—that caused Crimaldi's fearful reactions; but this testimony, if given, would not negate the government's case, for it is not necessary to prove that a witness was actually intimidated by the threats, but only that the threats had a reasonable tendency to intimidate. United States v. Carzoli, 447 F.2d 774 (7th Cir. 1971), cert. denied, 404 U.S. 1015, 92 S.Ct. 673, 30 L.Ed.2d 662 (1972).[6] See also Knight v. United States, 310 F.2d 305, 307 (5th Cir. 1962).

Nor did the particular circumstances of this case make Crimaldi's testimony material. Several cases have suggested that when an informer is the only witness to a transaction other than the accused or the police, the informer's testimony automatically becomes material and vital to the accused's defense so that the government must reveal his identity. Roviaro v. United States, 353 U.S. 53, 63–64, 77 S.Ct. 623 (1957), United States v. Barnett, 418 F.2d 309, 311 (6th Cir. 1969). Here, however, witness Crimaldi was not the only one who could controvert, explain, or amplify the testimony of Agent Braseth. Defendant

5. When Speice's counsel was cross-examining Braseth about Crimaldi's reactions to the threats uttered by the defendants, De Stefano interrupted and said: "May I acknowledge, without consulting him, Mr. Braseth is telling the truth in regards to him (Crimaldi) flushing. He did flush. I am sorry, but he did flush, and that is a true statement that Mr. Braseth made. He did more than flush."

6. In *Carzoli*, the defendant warned a person being questioned by FBI agents to be quiet, or else she would end up in a trunk. At trial, the person who received this apparent threat said she regarded defendant's words as a joke. The court said that it was not necessary for the government to prove that the defendant's words were interpreted as a threat in order to convict the defendant. Alternatively, the court said that the agent's testimony that the witness demonstrated physical signs of fear was sufficient to show that the words were taken as a threat.

Speice took the stand to testify to his version of the elevator incident; defendant De Stefano, acting as his own counsel, was able to bring in his version by his questions during trial; and both defendants had the option of calling Michael Polesti, a friend of theirs who got on the elevator at the second floor, as a witness.

█ Since there is no indication that Crimaldi would provide material and relevant evidence for defendant De Stefano, we find that the failure of the district court to subpoena Crimaldi did not violate De Stefano's right to compulsory process for witnesses in his favor.

*b) Right of Confrontation.*

Defendant Speice argues on appeal that he was denied his right to confront and cross-examine the witnesses against him when Agent Braseth testified concerning the sinister meaning Crimaldi gave to the inquiry, "Done any fishing lately?". We find that the failure of the district court to sustain objections to the indirect testimony of Crimaldi concerning the meaning of this question was a violation of Speice's sixth amendment rights.

After Agent Braseth had testified that Speice had directed the question, "Done any fishing lately?" to Crimaldi after De Stefano had made his dramatic threats about Crimaldi's fading memory and eyesight, government counsel sought to elicit the true meaning of Speice's question. Braseth related that in the past ten years during which he was a federal agent, he had gone underground and posed as a gangster many times, and had made hundreds of criminal associations. In the course of these associations he had heard expressions such as "fish bait," "We're going fishing," and "He's going to be fish bait," and that all these expressions meant that some person would be cut up and dumped into the lake. On cross-examination, however, Braseth's testimony took a different color. He testified that the only other time he had heard someone talk about "taking a person fishing" (aside from the elevator occurrence) was many years before when a tavern owner used it to intimate that he was going to kill a stool pigeon. The following exchange then occurred:

Q. And yet you told the Grand Jury that this is something that trigger men and murderers for the crime syndicate used, right?

A. Yes sir. That is what Mr. Crimaldi told me.

Speice's counsel moved to strike the portion of the answer relating to what Crimaldi told Braseth about the meaning of "Done any fishing lately?", but the motion was denied. On re-direct examination the government further elicited Crimaldi's testimony, through Agent Braseth, about the meaning of the disputed question. Braseth testified that he knew that "Have you done any fishing lately?" was a crime syndicate expression used by murderers for dumping a cut-up victim into a lake because Crimaldi told him so. Braseth also insisted that his interpretation of Speice's question was the same that Mr. Crimaldi had put on it. In its closing arguments to the jury, the government emphasized three times over objection that Speice's expression was a subtle threat to kill Crimaldi, for that was what it meant to Crimaldi.

█ The net effect of these repeated reminders to the jury of what interpretation Crimaldi put on the question "Done any fishing lately?" was to make Crimaldi a witness against Speice without granting Speice an opportunity to cross-examine Crimaldi as to his reasons for regarding the words as a threat, rather than an innocent inquiry into his sporting activities. It is plain that Crimaldi's testimony—through Agent Braseth—added "substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination," Bruton v. United States, 391 U.S. 123, 128, 88 S.Ct. 1620, 1623, 20 L.Ed.2d 476 (1968), and deprived Speice of his right to confront the witnesses against him. Pointer v. Texas, 380 U.S. 400, 404, 85 S.Ct. 1065, 13 L.Ed.2d 923

(1965). For this reason, we find that the admission of the testimony relating to Crimaldi's interpretation of the remarks, over the objection of the defendant, violated his right of confrontation as guaranteed by the sixth amendment of the United States Constitution.[7]

### III. Deliverance of Supplemental Charge to the Jury.

Defendant De Stefano has also presented a thoughtful argument attacking both the wording of a supplemental charge delivered to the jury during its deliberations and the circumstances under which it was delivered.

The jury began its deliberations at 5:45 p. m. on March 15, 1972 and continued, with time out for dinner, until 10:00 p. m. that evening. The next morning one of the jurors awoke with a slight headache, and promptly took two aspirin for relief. Finding that the aspirin upset her empty stomach, she skipped breakfast, but joined the other jurors to commence deliberations at 8:00 a. m. Noticing her distress, however, the jurors suggested that a nurse or doctor might be available, and sent an inquiry along these lines to the trial judge. By order of the judge, the sick juror was taken to the health unit, where she was given a medication commonly used for upset stomachs and was told to lie down for a while. After an hour, she pronounced herself fit to continue deliberations, and she rejoined the jury at 10:30 a. m. At 11:00 a. m. the trial judge gave the following instruction, which he claimed was in conformity with the mandate of this court in United States v. Brown, 411 F.2d 930 (7th Cir. 1969), cert. denied, 396 U.S. 1017, 90 S.Ct. 578, 24 L.Ed.2d 508 (1970):

In a large proportion of cases absolute certainty cannot be expected. The verdict must be the verdict of each individual juror and not a mere acquiescence in the conclusion of others. Each of you should examine the questions submitted with proper regard and deference for the opinions of each other, and you should consult with one another and deliberate with a view to reaching an agreement if it can be done without violence to individual judgment.

It is your duty to decide this case if you can conscientiously do so.

In the course of your deliberations a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous. No juror should surrender his honest conviction as to the weight or the effect of the evidence solely because of the opinion of his fellow jurors or for the mere purpose of returning a verdict. Each juror must decide the case for himself, but only after impartial consideration of the evidence with his fellow jurors.

If a large number of jurors favor conviction, the smaller number of jurors should consider the reasonableness of their doubt when it makes no impression upon the minds of other jurors who are equally intelligent and impartial and who have heard the same evidence.

If, on the other hand, a much larger number of jurors favor acquittal, the smaller number of jurors should ask themselves whether they might not

---

7. Indirect admission of Crimaldi's testimony without affording Speice his right of confrontation, however, did not amount to prejudicial error against De Stefano so that his conviction should be reversed. The evidence in the record is quite sufficient to establish that De Stefano uttered words that had a "reasonable tendency under the circumstances to place another in fear." Landry v. Daley, 280 F.Supp. 938, 962 (N.D.Ill.1968), rev'd on other grounds, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971), and that De Stefano acted in such a manner while speaking these words to underscore their threatening nature. There is also sufficient circumstantial evidence to support jurors' inferences that De Stefano knew that Crimaldi was to be a witness in a trial being conducted in federal court. Odom v. United States, 116 F.2d 996, 998 (5th Cir.), rev'd on other grounds, 313 U.S. 544, 61 S.Ct. 957, 85 L.Ed. 1511 (1941).

reasonably doubt the correctness of their judgment. Likewise, the jurors in a majority favoring a finding for either party should ask themselves whether they might not reasonably doubt the correctness of their judgment when it makes no impression upon the minds of the minority jurors, equally intelligent and impartial as they are, and who have heard the same evidence.

If you fail to agree on a verdict the case is left open and undecided. Like all cases, it must be disposed of some time. Any future jury must be selected in the same manner and from the same sources as you have been chosen, and there is no reason to believe that the case would ever be submitted to twelve men and women more competent than you to decide it, or that the case could be tried any better or more exhaustively than it has been here, or that more or clearer evidence could be produced on behalf of either side.

Let me again remind you, as I did in my instructions yesterday, that you are to consider the guilt or innocence of these defendants individually, based upon the evidence in regard to each of these defendants individually.

Ladies and gentlemen, you may now retire and reconsider the evidence in the light of this instruction.

Defendant De Stefano argues that he was prejudiced by the giving of the supplementary charge because 1) the language of the charge actually was outlawed by this court in *Brown*, and was sufficiently coercive to deprive him of trial by an impartial jury, and 2) the circumstances under which it was given made it inherently coercive.

In United States v. Brown, *supra*, this court was asked to hold that a version of the charge sanctioned in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L. Ed. 528 (1896) (the *"Allen* charge") was *per se* coercive and unconstitutional as a deprivation of due process and a denial of the right to trial by an impartial jury. Refusing to so hold, this court noted that supplemental instructions served a "beneficial role in the adjudication of cases despite the possibility of rare prejudice to the defendant." 411 F.2d at 932. Nevertheless, this court, in an attempt to articulate some standards for the delivery of supplementary charges, directed under its supervisory power that district courts within this circuit "comply with the standards suggested by the American Bar Association's Trial by Jury publication" [8] *Id.* at 933, and instruct juries in a "manner consistent with the recommended standards." *Id.* at 934.

Ironically, the controversy over the supplemental charge in this case results

8. American Bar Association Project on Minimum Standards for Criminal Justice. Standards Relating to Trial by Jury § 5.4 at 145–46 (Approved Draft 1968) [hereinafter cited as ABA Standards]. 5.4 Length of deliberations: deadlocked jury.

    (a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:

        (i) that in order to return a verdict, each juror must agree thereto;

        (ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

        (iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

        (iv) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

        (v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

    (b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

    (c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement.

from the failure of the *Brown* decision to be as precise as it intended to be in its identification of the objectionable elements of the *Allen* charge and its articulation of standards; for defendant De Stefano disputes whether the trial judge at his trial instructed the jury in a "manner consistent with the recommended standards." Obviously, the judge gave the jury the entire instruction contained in the ABA Standards—but he also added several other sentences that are the center of controversy. The issue, then, is whether these additional sentences conform to or detract from the ABA Standards.

The *Brown* opinion provides little guidance in our determination of whether the elements of the supplemental charge added by the trial judge to the ABA Standards violated the spirit of *Brown*. We are told by commentators that the ABA Standards, by virtue of their uninducing nature, may have to be supplemented by other instructions in order to get juries to pursue meaningful deliberations. United States v. Thomas, 146 U.S.App.D.C. 101, 449 F.2d 1177, 1192 (D.C.Cir.1971) (Robb, J. dissenting), Note, Supplemental Jury Charges Urging a Verdict—The Answer is Yet to Be Found, 56 Minn.L.Rev. 1199, 1214 (1972), Comment, The Allen Charge: Recurring Problems and Recent Developments, 47 N.Y.U.L.Rev. 296, 315 (1972). In fact, the ABA Standards do not prohibit the addition of any other instructions or require the use of any particular language, but merely identify five points on which the jury should be advised. ABA Standards, *supra* note 8, at 146. But the *Brown* opinion provides no guidance for ruling upon the propriety of additions to the ABA Standards, for it did not exhaustively articulate what aspects of the *Allen* charge it found inconsistent with the ABA Standards or objectionable for other reasons. Note, Supplemental Jury Charges Urging a Verdict, *supra,* at 1206. Consequently, we must consider what aspects of the *Allen* charge the *Brown* decision most likely found objectionable, whether the addition of the ABA instructions would correct any coercive impact of the elements of the *Allen* charge that were used in the supplemental charge delivered in the instant case, and whether the supplemental instruction, as a whole, was within the spirit of the *Brown* decision.

Our review of *Brown,* other judicial opinions, and various commentaries reveals almost a unanimous consensus as to what is objectionable about the language of the *Allen* charge. We believe that the supplemental charge given by the district court corrected or moderated the potentially coercive elements of the *Allen* charge that these authorities have implicated. Probably the single greatest source of potential coercion in the traditional *Allen* charge is its wording singling out the minority and directing them alone to re-examine their thinking,[9] thus turning the deliberation process into a sort of "Gallup Poll" mechanism. Commentators have suggested that any suggestion to the minority to reconsider its view should be balanced by a similar suggestion to the majority to reconsider its view in the light of the arguments of the minority,[10] and

---

9. United States v. Fioravanti, 412 F.2d 407, 417 (3d Cir.), cert. denied, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969), Burrup v. United States, 371 F.2d 556, 559 (10th Cir. 1967) (Phillips, J., concurring), Note, Supplemental Jury Charges Urging a Verdict—The Answer Is Yet To Be Found, 56 Minn.L.Rev. 1199, 1210 (1972), Comment, The Allen Charge: Recurring Problems and Recent Developments, 47 N.Y.U.L.Rev. 296, 315 (1972). Note, Due Process, Judicial Economy and the Hung Jury: A Re-Examination of the

Allen Charge, 53 Va. L.Rev. 123, 143 (1967).

10. United States v. Flannery, 451 F.2d 880, 883 (1st Cir. 1971), United States v. Sawyers, 423 F.2d 1335, 1340 (4th Cir. 1970), Mangan v. Broderick & Bascom Rope Co., 351 F.2d 24, 30 (7th Cir.), cert. denied, 383 U.S. 926, 86 S.Ct. 930, 15 L.Ed.2d 846 (1965), Supplement to Report of the Committee on the Operation of the Jury System of the Judicial Conference of the United States 2 (1969),

by the admonition to jurors that they should not abandon their views if they are honestly convinced.[11] The supplemental charge delivered in Mr. De Stefano's trial contained these "balancing elements" to remove any potential coercion inherent in the admonition to minority jurors only. Commentators have also attacked the notice to jurors contained in variations to the *Allen* charge that if they do not decide the case, it must be retried.[12] The instant supplemental charge has deleted such language and has substituted it with language that courts have found more acceptable.[13] Finally, the critics object to the language in the *Allen* charge that implies that there is a duty to decide the case so that jurors should listen to each other with a disposition to be convinced.[14] The supplemental charge given by the trial court, however, deleted any language coercing the reaching of a verdict and, instead, specifically told jurors not to surrender conscientiously held convictions.

Defendant De Stefano argues, however, that the supplemental charge delivered by the district court contained significant aberrations from the ABA Standards, and that pursuant to *Brown* this court should reverse his conviction under its supervisory power. Dissecting the supplemental charge given by the trial judge, he cites several allegedly coercive aspects of it. We find that, taken together, these objections do not demonstrate a substantial departure from the spirit of the *Brown* decision to merit reversal of the defendant's conviction. Although we are of the opinion that the charge must be considered as a whole in order to gauge its effect upon the jury, we will consider what we think are the more important of the defendant's individual attacks on the charge.

Defendant De Stefano first argues that the admonition to the jury that "absolute certainty cannot be expected" is actually a denigration of the reasonable doubt standard. He contends that since the instruction on reasonable doubt was not given with the supplemental instruction, the jury could have construed this admonition as allowing a different standard than that of reasonable doubt for finding him guilty. The defendant did not request that the trial judge reinstruct the jury on the meaning of the reasonable doubt standard when he learned that the supplemental charge was to be given. *See,* United States v. Hynes, 424 F.2d 754, 758 (2d Cir.), cert. denied, 399 U.S. 933, 90 S.Ct. 2270, 26 L.Ed.2d 804 (1970). Although we do not believe that the use of this instruction should be encouraged, we cannot say that it vitiated the reasonable doubt standard, for the remainder of the instruction three times told the jurors to

---

Comment, On Instructing Deadlocked Juries, 78 Yale L.J. 100, 140 (1968).

With reference to the argument by defendant De Stefano that the address to both the majority and the minority to re-examine their respective positions is contrary to the ABA Standards, the following comment is instructive:

Since the ABA charge encourages each juror not to hesitate to re-examine his thinking the minority may argue that both the majority and minority position should be rethought. This device makes it as clear as possible that the court is not favoring majority thinking solely because it is majority thinking.

Note, Supplemental Jury Charges, *supra* note 9, at 1212 n. 75. In essence, what the trial judge in the instant case did was to make obvious what the ABA Standards implicitly tell jurors to do.

11. Comment, The Allen Charge, *supra* note 9, at 302.

12. United States v. Brown, 411 F.2d 930, 933 (7th Cir. 1969), cert. denied, 396 U.S. 1017, 90 S.Ct. 578, 24 L.Ed.2d 508 (1970), United States v. Flannery, 451 F.2d 880, 883 (1st Cir. 1971).

13. United States v. White, 382 F.2d 445, 450 (7th Cir. 1967). *See also,* Brandom v. United States, 431 F.2d 1391, 1399 (7th Cir. 1970), cert. denied, 401 U.S. 942 91 S.Ct. 950, 28 L.Ed.2d 223 (1971) where an instruction substituting the language "the case is left open and undecided and like all cases, it must be disposed of some time" for the language "the case must be retried" was found to be preferable to the *Brown* instruction.

14. Note, Supplemental Jury Charges, *supra* note 9, at 1212–13.

consider the reasonableness of their doubts and instructed them to abandon their previously formulated opinions about the evidence only if they were "convinced" that their opinions were "erroneous."

Defendant De Stefano also objects to the supplemental instruction because it contains too many exhortations to jurors to listen to the opinions of others. But the instruction also admonishes the jurors not to abandon positions conscientiously held, and tells them not to abandon their own opinions if to do so would do violence to their individual judgment. In fact, the exhortations in the supplemental charge only encouraged the jurors to do what they were supposed to do —to engage in a group deliberation that will screen out errors, negate biases, and eliminate erroneous hypotheses.[15]

Finally, defendant argues that the portion of the supplemental charge telling the jury that "no more or clearer evidence could be produced on behalf of either side" is prejudicial because the jury could have interpreted it as a sign that Crimaldi had disappeared, probably because De Stefano and Speice had actually carried out their threats. This argument overlooks the facts that during the trial the defendants themselves made pointed references to the failure of the government to produce Crimaldi, and that they thus created the distinct impression that it was the government who was responsible for Crimaldi's absence.[16] Furthermore, the trial judge repeatedly instructed the jury to base its verdict only on the evidence presented in the courtroom.

■ We find, therefore, that the wording of the supplemental charge is consistent with *Brown* so that the reversal of defendant De Stefano's conviction pursuant to our supervisory power is not required.

■ Defendant De Stefano also argues that the peculiar circumstances surrounding the delivery of the supplemental charge made it coercive. He contends that the judge was pressuring the jury into a hasty verdict because of his realization that the sickness of the juror with the upset stomach could have prevented the agreement on any verdict. The evidence indicates, however, that the particular juror had already expressed her satisfaction with her health and her ability to deliberate before she returned to the jury room. Furthermore, no language in the instruction urged a speedy verdict, and the defendant can point to no other evidence of coercion under the circumstances other than his own speculations on the motivation of the judge in delivering the charge. We find that the presence of the ill juror did not make the delivery of the supplemental charge coercive under these circumstances. United States v. Grosso, 358 F.2d 154 (3d Cir. 1966), rev'd on other grounds, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968).

■ Nor was the timing of the charge coercive *per se* or a violation of the ABA Standards. Defendant argues first that the charge should have been

---

15. C. Joiner, Civil Justice and the Jury 26–27 (1962). *See also*, Johnson v. Louisiana, 406 U.S. 356, 361, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), Apodaca v. Oregon, 406 U.S. 404, 379, 92 S.Ct. 1628, 1642, 32 L.Ed.2d 184 (Powell, J. concurring, in an opinion filed with Johnson v. Louisiana.)

16. During closing argument, for example, De Stefano argued:
　　Then let's go to the main witness, their chief witness Crimaldi. I have demanded, subpoenaed and done everything to bring him here.

When the government objected to this line of argument, Speice's counsel interjected:
　　I believe Mr. De Stefano misunderstood your Honor's ruling. I am sure your Honor is not telling him that he cannot comment upon the failure of the government to bring in Mr. Crimaldi.

Although De Stefano and Speice's counsel were ordered to desist in their remarks about Crimaldi's absence, the jury nevertheless got the inevitable impression that the government was responsible for his nonappearance.

given with all the other instructions before the jury retired for its deliberations and that it could be given later only if all the other instructions were also repeated. The ABA Standards, however, plainly indicate that:

> If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a).

Thus, the ABA Standards do not require that the supplemental charge be given before deliberations begin; nor do they require the repetition of all the other instructions with the supplementary charge when the jury has been unable to agree. Defendant De Stefano's second argument about the timing of the charge relies upon United States v. Contreras, 463 F.2d 773 (9th Cir. 1972), where the court reversed a conviction after the trial judge gave the *Allen* charge to a jury which had asked instead for instructions on evidence and points of law. The court said that the *Allen* charge should be given only when it is warranted, and the failure of the jury to indicate that it was deadlocked indicated that the supplemental instruction was not warranted. We find *Contreras* distinguishable on its facts—for here the jury did not show confusion about the law, but rather an inability to reach a verdict. Since the ABA Standards allow the delivery of a supplementary charge when a court perceives such a situation, and since reviewing courts ordinarily grant trial judges discretion in determining whether to give such a charge, we cannot follow *Contreras* in the circumstances in this case. Furthermore, the fact that the jury did not indicate that it was deadlocked before the instruction was given may actually be taken as evidence that the charge was not coercive, since under such circumstances dissenting jurors would be less likely to believe that the trial judge was trying to shake their decision.[17] In addition, the fact that the jury continued to deliberate for at least four more hours after the supplemental charge was delivered indicates that instead of it having the coercive effect of the majority running roughshod over the minority, the supplemental charge caused the jury to take additional time to deliberate.[18]

We find, then, that neither the language of the supplementary charge nor the circumstances under which it was delivered warrant a finding that it was a violation of the defendant's constitutional rights or inconsistent with our earlier *Brown* decision.

## IV. Other Objections

Defendant De Stefano has also raised an assortment of other objections. We do not believe that any or all of these objections taken together merit reversal of his conviction.

For the above reasons, the conviction of defendant Sam De Stefano is affirmed, and the judgment of conviction of Edward Speice is reversed and remanded for further proceedings.

FAIRCHILD, Circuit Judge (concurring in part, dissenting in part).

I concur in reversal of the judgment against Speice.

With all respect, I reach different conclusions on two propositions, which would also lead to reversal as to De Stefano.

First: I think both defendants were entitled to the government's assistance in serving a subpoena on Crimaldi. Perhaps he would have defied it, raising

---

17. United States v. Martinez, 446 F.2d 118, 119 (2d Cir.), cert. denied, 404 U.S. 944, 92 S.Ct. 297, 30 L.Ed.2d 259 (1971), United States v. Sensholtz, 435 F.2d 4, 7 (10th Cir. 1970).

18. United States v. Bambulas, 471 F.2d 501 at 506 (7th Cir. 1972); United States v. Pope, 415 F.2d 685, 690–691 (8th Cir. 1969), cert. denied, 397 U.S. 950, 90 S.Ct. 973, 25 L.Ed. 132 (1970).

an issue for the court to resolve, but the prosecution should not be interposed between the defendant and his sixth amendment right to compulsory process. His testimony was so critical to the determination of truth in these circumstances that the defendants should not be required to demonstrate the extent to which his testimony would be favorable to them, as compared with the testimony of Braseth.

Second: I consider portions of the supplementary charge objectionable under United States v. Brown, 411 F.2d 930 (7th Cir. 1969): (1) The admonition that absolute certainty cannot be expected; (2) the directions to the jurors who are in the minority to reexamine their views; (3) the portion which suggests that a different jury will be no better able to decide the case if left open by the present jury.

Before SWYGERT, Chief Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.

## AMENDED ORDER

This matter comes before the Court on the motion of Julius Lucius Echeles, counsel for the defendant-appellant, suggesting the death of the defendant-appellant Sam DeStefano on April 14, 1973.

The appellant's conviction was affirmed on February 14, 1973, and a petition for rehearing and a suggestion of a rehearing en banc was filed by appellant on February 23, 1973. Prior to appellant's death, a majority of the circuit judges who are in regular active service voted pursuant to Rule 35(a) of the Federal Rules of Appellate Procedure to rehear the appeal en banc.

It is ordered that the appeal is dismissed as moot and the district court is directed to enter an order vacating the judgment of conviction and dismissing the indictment as moot.