## CROSBY v. UNITED STATES.

### No. 4053.

United States Court of Appeals
Tenth Circuit.

June 30, 1950.

Duke Duvall and John A. Johnson, both of Oklahoma City, Okla., for appellant.

Robert E. Shelton, U. S. Atty., of Oklahoma City, Okla., for appellee.

Before PHILLIPS, Chief Judge, and HUXMAN and PICKETT, Circuit Judges.

HUXMAN, Circuit Judge.

This appeal is from a conviction of violation of 18 U.S.C. 338, (now 18 U.S.C.A. § 1341), (use of mails to defraud). Crosby was tried in the United States District Court for the Western District of Oklahoma. Trial was had to the court without jury and Crosby was found guilty and sentenced to three years upon each of thirty counts, the sentences to run concurrently. This appeal followed.

The alleged scheme to defraud arose out of a publication venture by Crosby and G. L. Shepard. On or about March 12, 1943, he and his partner, G. L. Shepard, began a publishing business in Oklahoma City under the name of the Victory Publishing Company. The purpose of the business was to sell space for photographs and war-service biographies, which, when compiled, would be printed in a history to be known as "The Fighting Men of Oklahoma."

At the outset of the business an agreement was drawn up providing for the establishment of a trust fund as a reserve to be used in the production of the history.[1]

---

1. The Trust Agreement provided:
"Trustor further agrees that said fund shall be held by the trustee until such time as all subscription contracts received by trustor have been fully complied with

Thereafter the partnership employed salesmen and started business.[2] The salesmen promised prospective customers a six-volume work and as per instructions, they relied heavily in their sales talk on the trust agreement. The booklet employed by the salesmen in securing subscriptions contained a letter from the Liberty National Bank dated July 5, 1945, stating that the trust account had a balance of $50,000.00. It also contained a letter from Clyde H. Hale, an attorney in Oklahoma City, interpreting the trust agreement.[3] The booklet also included a letter from the Liberty National Bank dated October 5, 1945, showing a credit balance of $81,142.96 in the trust fund. A note was attached by the Victory Publishing Company stating that the trust fund had been kept up in accordance with the trust agreement and that the trust fund was "devoted exclusively to underwriting the cost of publication." Also included was an affidavit by Crosby stating that the Victory Publishing Company had been depositing and would continue to deposit the requisite thirty per cent. Sales to subscribers went on until May, 1946. On June 30, 1947, all funds having been exhausted, the books were closed. During its operation, the business took in a total of $660,820.55. It delivered only two of the promised six volumes.

The indictment charged Crosby with using the mails to defraud in that he committed or acquiesced in numerous fraudulent practices and representations during the course of business.[4]

■ The elements which constitute the offense are the formation of a scheme to defraud and the use of the mails in furtherance thereof. The use of the mails stands

---

by trustor; PROVIDED, HOWEVER, that upon receipt of statements approved by Ernest M. Crosby, or upon receipt of other good and sufficient evidence of the correctness and nature of same, the trustee may issue checks against said trust fund account and pay direct to the publishers, artists, write-up men and others contributing to the publication of said book, the actual cost of publication. All checks issued against said account shall be signed by the trustee and countersigned by G. L. Shepard."

(In November, 1943, the 20% in the trust agreement was increased to 30%.)

2. Appellant bought Shepard's interest in the business in September, 1944.

3. The pertinent parts of Hale's letter are as follows:

"Another inquiry made by me was as to the steps which Mr. Crosby and the Company had taken to insure publication and distribution of this history. I learned that 30% of the collections, after salesmen's commissions have been paid, have been and are now being deposited in a trust fund which is to be devoted exclusively to the printing and distribution of the History, and that the trust fund cannot be withdrawn by anyone connected with the company for any purpose except to pay publication costs and then only with the joint signature of the trustees; that complete bond coverage is being maintained on all employees; and that Mr. Crosby has insured his own life and the life of his partner, further to assure publication of the History."

\* \* \*

"I am fully convinced that Mr. Crosby is honest; efficient in the managing of the company; sincere in all of his efforts; that he has done everything reasonably possible to safeguard his subscribers and to assure them that the work will be completed as represented."

4. The pertinent false and fraudulent representations, pretenses and promises charged in the indictment are:

"(b) That every precaution had been taken to insure and make certain that the said book or books would be printed and published and delivered to said purchasers;

"(c) That the said Victory Publishing Company had set up a trust fund for the purpose of publishing said book or set of books and 'that said Victory Publishing Company has been depositing and will continue to deposit in the Liberty National Bank of Oklahoma City on or before the 10th of the month following receipt thereof, 30% of all net receipts (meaning gross receipts less commissions paid salesmen) from contracts entered into with its subscribers,' and it was represented to said purchasers or subscribers that said trust fund was and would be sufficient or more than sufficient to pay all costs of printing and publishing of said books and further that the said trust fund could not be withdrawn for any purpose except to pay publication costs; \* \* \*."

admitted so we are concerned solely with the question whether there is substantial evidence supporting the trial court's finding that appellant employed a fraudulent scheme with intent to defraud.

The parties are not in agreement as to the proper permissible charges against the trust fund. Appellant contends that costs of gathering data and material for biographical sketches which were charged against the trust account were proper charges against such account. The Government, on the other hand, contends that the costs of printing and publishing the books were the only charges that could be made against the account. The trial court ruled that only costs of printing and publishing the books could be charged against the trust fund. While the trust agreement, considered alone, authorizes a broader use of the trust funds than found by the trial court, the interpretation placed on the trust agreement by Hale's letter and conveyed to the subscribers by use of the mails, supports the conclusion of the trial court. Hale's letter specifically stated that the trust funds would be used exclusively for printing and publication of the books. The prospectus also contained the letter from the Liberty National Bank dated October 9, 1949 showing a credit balance in the fund of $81,142.-96, with a note by the Victory Publishing Company stating that the trust fund had been accumulated in accordance with the trust agreement and that the trust fund is "devoted exclusively to underwriting the cost of the publication, The Fighting Men of Oklahoma," and an affidavit by Crosby stating that the Victory Publishing Company had been depositing and would continue to deposit in the Liberty National Bank thirty per cent of all net receipts, meaning receipts less commissions paid to salesmen from contracts entered into with subscribers. We think the record supports the court's construction placed upon the trust agreement.

It is clear from the record that the funds were not being deposited in compliance with the trust agreement or as represented in Crosby's affidavit. In fact, Crosby admitted that the trust fund requirements were $125,141.01 and that only $90,655.47 was actually deposited in the trust fund. His contention, however, was that he should be credited with certain expenditures in which he by-passed the trust fund. None of these expenditures, however, were for printing and distribution costs. Some of them were for salesmen's salaries and traveling expenses of salesmen while they were attempting to sell subscribers a better binding for the work.

Appellant's defense was good faith or absence of fraudulent intent. Fraudulent intent is an essential element of the crime with which Crosby was charged. As has been said many times, fraudulent intent is in many instances not susceptible of proof by direct evidence. In numerous cases it must be inferred from a series of acts and pertinent circumstances.[5] One will not be heard to say that he did not intend the natural consequences of his conduct. "If a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent."[6]

It is true, as urged by Crosby, that the increase in publication costs which could not have been foreseen contributed to the failure of the venture. We, however, think there is sufficient evidence in the record to support a finding that Crosby wilfully failed to carry out the promises made with respect to the trust fund in the trust instrument under the interpretation placed thereon by Hale's letter, the letter of the Liberty National Bank, the note of the Victory Publishing Company attached thereto stating that the trust fund had been kept up in accordance with the trust agreement and that the trust fund was "devoted entirely to underwriting the cost of the publication," and Crosby's affidavit stating that the Victory Publishing Company had been depositing and would con-

5. Rice v. United States, 10 Cir., 149 F.2d 601; Estep v. United States, 10 Cir., 140 F.2d 40.

6. Ellis v. United States, 206 U.S. 246, 257, 27 S.Ct. 600, 602, 51 L.Ed. 1047, 11 Ann. Cas. 589.

tinue to deposit the requisite thirty per cent.

The large withdrawals made by both Crosby and his wife during the period of time when the trust fund was not being administered as represented in the agreement and in the interpretative letters and affidavits is a circumstance worthy of consideration in determining intent. In 1943, Crosby withdrew $2700.00 from the receipts from subscribers. Between January 1, 1944 and September 30, 1944, he withdrew $19,750.00. Between October 1, 1944 and July 31, 1945, he withdrew $15,844.74, and his wife, L. M. Crosby, withdrew $1,894.50. Between August 1, 1945 and July 31, 1946, Crosby withdrew $35,297.27 and his wife withdrew $19,852.40. Between August 1, 1946 and July 31, 1947, he withdrew $6,677.41, and his wife withdrew $1,129.31. In all, during this period of time, he withdrew $80,269.42, and his wife withdrew $22,876.21.

It is our conclusion that considered in their entirety, the admitted facts, the letters and writings and the circumstances and inferences deductible therefrom support the findings of the trial court. We cannot say, as a matter of law, that its findings and judgment are without support in the record.

Affirmed.