**UNITED STATES of America,
Appellee,**

v.

**Cheryl E. SEASHOLTZ and James E.
Seasholtz, Appellants.**

**Nos. 714–69, 715–69.**

United States Court of Appeals,
Tenth Circuit.

Dec. 10, 1970.

For reversal it is contended here: (1) That the prosecution prejudicially failed to disclose prior to trial that no evidence would be offered to show that Cheryl's illness was feigned or that her surgery was unnecessary; (2) the trial court failed to require the prosecution to disclose the names and addresses of the witnesses to be used at the trial, the order of their appearance and the substance of their testimony; (3) a prejudicial (Allen) instruction was given after the case had been submitted to the jury; and (4) there was insufficient evidence to sustain the verdict.

John J. Immel, Asst. U. S. Atty., Wichita, Kan. (Robert J. Roth, U. S. Atty., District of Kansas, with him on the brief), for appellee.

J. L. Gueck, Denver, Colo. (William H. Erickson, Denver, Colo., and James Shaw, Galena, Kan., with him on the brief), for appellants.

Before PHILLIPS, PICKETT and HILL, Circuit Judges.

PICKETT, Circuit Judge.

The appellants, James E. Seasholtz and his wife Cheryl, were convicted on 11 counts of a 15-count indictment charging them with using the mails to defraud in violation of 18 U.S.C. § 1341.[1] In substance, the indictment alleged that Seasholtz and Cheryl devised a scheme to defraud numerous companies engaged in writing health and accident insurance by making applications for insurance covering Cheryl and thereafter making claims to each company for the same illness. It was further alleged that it was a part of the scheme when applications were submitted or claims for benefits under the policies were made to falsely indicate that there was no insurance with other companies. The plan of obtaining the numerous policies is admitted, as is the use of the mails in connection therewith. After conviction the appellants were sentenced on each count to imprisonment for the maximum term authorized by law (5 years) under the provisions of 18 U.S.C. § 4208(b), all sentences to run concurrently.

A voluminous record discloses that from March 1, 1965 through July 1, 1966, and for a number of years prior thereto, Seasholtz was a practicing Doctor of Osteopathy in the area of the town of Galena, Kansas. Early in the year 1965 Seasholtz was divorced from his wife and married Cheryl. Near the time of the marriage written applications for health and accident insurance were made for Cheryl and mailed to 37 different companies. The applications were prepared and signed by Cheryl, usually in her maiden name. In substantially all of the applications, in the space following the question relating to the existence of other insurance, the answers were either "No," "None," or a line was drawn through the space for an answer. Thereafter, when claims for benefits under the policies were made, the medical portions were all prepared by Seasholtz and included a statement that he was the attending physician. When the claims requested information as to the existence of other insurance, the same procedure was followed as in the applications.

Before the applications were made, Seasholtz, apparently anticipating possible conflicts with the law, made casual inquiry of two attorneys as to the legal consequences of obtaining multiple policies for the same insured. In each instance Seasholtz was told that in the at-

---

1. A mistrial was declared as to a conspiracy count (No. 15) and three counts were dismissed by the United States.

torney's opinion no criminal law would be violated, but if the companies learned of the existence of multiple policies, in all probability the claims would be disallowed and the policies canceled. Neither of the attorneys told Seasholtz that the plan would not constitute a fraud, and no reference was made to a possible violation of the United States Mail Fraud Statutes.

Seasholtz had previously owned a hospital in the nearby town of Grove, Oklahoma. In August, 1965 he made arrangements with the then owner of the hospital to be available and in the hospital for approximately two weeks while the owner was on vacation.[2] During that time Cheryl was admitted to the hospital because of a stomach disorder. She remained there for seven days. The usual daily hospital charge for a room was $16.00; the rate for Cheryl was $25.00. Claims for this illness were prepared by the Seasholtzes and mailed to each of the insurance companies with which Cheryl held policies. Attached to each claim was an identical hospital statement on which Dr. Seasholtz was shown as the attending physician.

After the sale of the Grove, Oklahoma hospital, Seasholtz established a connection with a Dr. Martin, also an Osteopath, in Joplin, Missouri and was working closely with him in the Oak Hill Hospital of that city. In February, 1966 Cheryl was admitted into that hospital where a gall bladder operation was performed by Dr. Martin, who made a charge of $350.00 for his services, $125.-00 of which was paid by Blue Shield Insurance. Following this hospitalization insurance claims were made as they were for Cheryl's illness in August of 1965. These claims included a $350.00 doctor's fee in addition to other hospital charges. The amounts collected for Cheryl's two illnesses were approximately $8,000.00 each.

At a pretrial conference as provided for in Rule 17.1 of the Federal Rules of Criminal Procedure, the defense sought to obtain a transcript of the Grand Jury proceedings for the purpose of determining if there had been any medical evidence before the Grand Jury to the effect that Cheryl's hospitalization and surgery were unnecessary. It was then urged by the defense that fraud could be established only by evidence that Seasholtz and Cheryl knew of the pending hospitalization and surgery at the time the applications for insurance were made, or that the claims were made for unnecessary hospitalization and surgery. The prosecution did not advise the defense that it would be unable to prove that the illnesses of Cheryl were feigned. It did, however, indicate the possibility that the evidence would be sufficient for the jury to conclude that there was no need for the hospitalization and the surgery.[3] During the trial, the prosecution announced that no evidence would be offered to show that Cheryl's hospitalization and surgery were unnecessary.

█ It is now urged for the first time that the failure of the prosecution to disclose at the pretrial conference that it would not question the validity of the hospitalization and surgery was prejudicial because it deprived defendants of adequate services of counsel in that evidence of this nature was anticipated and time of counsel was unnecessarily used in the preparation of a defense to this issue. There is no merit to this contention. The record does not disclose that the accuseds were deprived of any defense because of the failure to make the disclosure before trial. The prosecution produced at the trial as wit-

---

2. Seasholtz had formerly sold the hospital to the then owner, who is also a practicing Doctor of Osteopathy.

3. In the discussion of this subject, the district attorney stated: " * * * I think when we show these forty-three policies that were taken up and suddenly they have the gall bladder out I have got—I think the jury will take a little thought of it."

nesses the doctor who performed the gall bladder operation and the administrator of the Grove Memorial Hospital during Cheryl's confinement there. Except for the statement of defense counsel, the record is completely devoid of evidence showing that appellants were prejudiced in any manner in preparing their defense.

■ Appellants also contend that they were denied an adequate opportunity to prepare their defense by the court's refusal to order the government's attorney to disclose the names of the prosecution's witnesses, the order of their appearance, and the substance of their testimony. The law is settled that in the absence of a statutory or constitutional requirement the government is not required to endorse the names of its witnesses on the information or indictment, nor is there a requirement that the government disclose its witnesses in any other manner, except in the case of a trial for a capital offense. Edmondson v. United States, 402 F.2d 809 (10th Cir. 1968); Cordova v. United States, 303 F.2d 454 (10th Cir. 1962); Dean v. United States, 265 F.2d 544 (8th Cir. 1959).

■■ It is next contended that the trial court erred in giving an "Allen" type instruction after the case had been submitted to the jury. Prior to the giving of the supplemental instructions, the foreman of the jury indicated that progress was being made in their deliberations. After a full day of deliberation, the court, before excusing the jury for the night, stated:

"Members of the Jury, the Court calls you back because you have been working all day and we are not like the old English Courts that used to keep Juries together without food, or drink, except water, until they agreed upon a verdict. We don't do that. Would you like to go home and come back in the morning?"

Appellants seize upon this as indicative of the coercive disposition of the court. Quite the contrary, we find the language of the court to indicate a concern that the jurors not find themselves put upon but rather given an opportunity to return another day to continue their deliberations refreshed. Upon its return the following morning the jury was instructed by the court with what has become generally characterized as the "Allen" instruction.[4] The court made it quite clear that it did not "wish any Juror to surrender his or her conscientious objections" nor to "surrender your honest convictions as to the weight or effect of evidence solely because of the opinion of other Jurors, or for the mere purpose of returning a verdict." There is no indication in the record that the jury was deadlocked when the instructions were given. Indeed, after the instruction was given it was later determined that the delay was occasioned by the failure of the jury to agree on a verdict as to one of the counts and a mistrial was declared as to that count. Under the circumstances presented here, in which there is no general deadlock and no indication of coercion by the court for the jury to reach a verdict, and the court's instruction is in essence directed to the jury as a whole, we cannot conclude that the giving of the instruction was coercive or error. Munroe v. United States, 424 F.2d 243 (10th Cir. 1970), and cases cited therein.

Finally it is urged that there is no substantial evidence to sustain the convictions and that the motions for acquittal should have been sustained. Stated briefly, the argument is that the plan of the Seasholtzes to purchase a large number of policies in various insurance com-

4. In substance, the instruction told the jury that each member should give proper deference to the opinions and views of the others and if a greater number was for conviction or acquittal, consideration should be given to this situation as it might or might not bear on the responsibility of the various jurymen in reaching a verdict.

panies and to obtain multiple insurance payments for the same medical expenses was not with intent to defraud because they contracted separately with each company after they had been advised by attorneys and an insurance agent that such activity was not illegal.

The basic elements of a violation of the Mail Fraud Statutes are (1) a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and (2) use of the United States Mails to further the scheme. Gusow v. United States, 347 F.2d 755 (10th Cir. 1965), cert. denied, 382 U.S. 906, 86 S.Ct. 243, 15 L. Ed.2d 159; Beck v. United States, 305 F.2d 595 (10th Cir. 1962), cert. denied, 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed.2d 123. We have said that a scheme to defraud under the statute is one in which it is "reasonably calculated to deceive persons of ordinary prudence and comprehension." Gusow v. United States, *supra*, 347 F.2d at 756. Willful intent may be inferred from the statements and activities of the parties to the scheme. Elbel v. United States, 364 F. 2d 127 (10th Cir. 1966), cert. denied, 385 U.S. 1014, 87 S.Ct. 726, 17 L.Ed.2d 550, reh. denied, 386 U.S. 939, 87 S.Ct. 959, 17 L.Ed.2d 812; Gusow v. United States, *supra*. In Crosby v. United States, 183 F.2d 373, 375 (10th Cir. 1950), cert. denied, 340 U.S. 906, 71 S. Ct. 274, 95 L.Ed. 856, this court said:

" * * * Fraudulent intent is in many instances not susceptible of proof by direct evidence. In numerous cases it must be inferred from a series of acts and pertinent circumstances. (Citations omitted) One will not be heard to say that he did not intend the natural consequences of his conduct. 'If a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent.' (Citations omitted)"

In determining the sufficiency of the evidence in a criminal case, appellate courts appraise the evidence, both direct and circumstantial, in the light most favorable to the prosecution, together with the reasonable inferences to be drawn therefrom, and will not weigh the evidence or test the credibility of the witnesses. Havelock v. United States, 427 F.2d 987 (10th Cir. 1970); Glazerman v. United States, 421 F.2d 547 (10th Cir. 1970), cert. denied 398 U.S. 928, 90 S.Ct. 1817, 26 L.Ed.2d 90; Bailey v. United States, 410 F.2d 1209 (10th Cir. 1969), cert. denied, Fruman v. United States, 396 U.S. 933, 90 S.Ct. 276, 24 L.Ed.2d 232. We are satisfied that the evidence is ample to present a jury question. It is clear that the appellants devised a scheme to obtain numerous insurance policies from different companies and in the applications for the policies did misrepresent the existence of other insurance or applications therefor. The scheme further included application for and the receipt of payment from each insurance company for the same medical expense incurred after the issuance of the policies. Of course, the application for or obtaining of insurance with more than one company does not necessarily constitute a fraud, but before the issuance of a policy, if the company requests information as to the existence of or applications for other insurance, it is entitled to have a truthful statement prior to a determination of whether the insurance will be issued. This same information may well be of importance to an insurance company when claims are made for payments under a policy. Attempts to recover payment from a large number of insurance companies, as was the case here, could, in itself, cause the claim to be suspect. Considering the scheme as a whole, we are convinced that it was sufficient to sustain a jury finding that it was calculated to deceive the insurance companies and to elicit money from them by false representations. An inquiry by applicants under these circumstances as to the legality of such a plan

only presents a question of intent to be determined by a jury. Furthermore, ignorance or mistake of law is no defense. Braswell v. United States, 224 F.2d 706 (10th Cir. 1955), cert. denied, 350 U.S. 845, 76 S.Ct. 86, 100 L.Ed. 752.

Affirmed.