UNITED STATES of America, Plaintiff-Appellee,

v.

Jack Lee WOLF, a/k/a Jack L. Wolf, Defendant-Appellant.

No. 76–1532.

United States Court of Appeals, Tenth Circuit.

Submitted May 16, 1977.

Decided Sept. 9, 1977.

John E. Green, First Asst. U. S. Atty., Oklahoma City, Okl. (David L. Russell, U. S. Atty., Oklahoma City, Okl., with him on the brief), for plaintiff-appellee.

Philip F. Horning of Bulla, Horning & Johnson, Oklahoma City, Okl., for defendant-appellant.

Before PICKETT, SETH and McWILLIAMS, Circuit Judges.

PICKETT, Circuit Judge.

Appellant Wolf appeals from a conviction on five counts of a six count indictment which charged him with using the United States Mails to execute a scheme to defraud in violation of 18 U.S.C. § 1341. It is contended that the evidence is insufficient to sustain the verdict and that there was prejudicial error in the cross-examination of the accused concerning former convictions.

The gist of the scheme to defraud alleged in the indictment was that Wolf, operating through two corporations, manufactured and sold to customers a product described as wooden pallets;[1] that in order to finance his operations, Wolf, on behalf of the corporations, entered into contracts with Liberty-Heller Factors, Inc. whereby Liberty-Heller agreed to purchase outstanding customer accounts receivable due to the Wolf corporations; that Wolf fraudulently obtained large amounts of money from Liberty-Heller by presenting fictitious invoices of customer accounts and by receiving and retaining payments made by customers whose accounts had been previously assigned to Liberty-Heller.

The general legal principles applicable in mail fraud cases such as this are set out in *United States v. Seasholtz*, 435 F.2d 4 (10th Cir. 1970), as follows:

The basic elements of a violation of the Mail Fraud Statutes are (1) a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and (2) use of the United States Mails to further the scheme. *Gusow v. United States*, 347 F.2d 755 (10th Cir. 1965), cert. denied, 382 U.S. 906, 86 S.Ct. 243, 15 L.Ed.2d 159; *Beck v. United States*, 305 F.2d 595 (10th Cir. 1962), cert. denied, 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed.2d 123. We have said that a scheme to defraud under the statute is one in which it is "reasonably calculated to deceive persons of ordinary prudence and comprehension." *Gusow v. United States, supra*, 347 F.2d at 756. Willful intent may be inferred from the statements and activities of the parties to the

scheme. *Elbel v. United States*, 364 F.2d 127 (10th Cir. 1966), cert. denied, 385 U.S. 1014, 87 S.Ct. 726, 17 L.Ed.2d 550, reh. denied, 386 U.S. 939, 87 S.Ct. 959, 17 L.Ed.2d 812; *Gusow v. United States, supra*. In *Crosby v. United States*, 183 F.2d 373, 375 (10th Cir. 1950), cert. denied, 340 U.S. 906, 71 S.Ct. 274, 95 L.Ed. 656, this court said:

". . . Fraudulent intent is in many instances not susceptible of proof by direct evidence. In numerous cases it must be inferred from a series of acts and pertinent circumstances. (Citations omitted) One will not be heard to say that he did not intend the natural consequences of his conduct. 'If a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent.' (Citations omitted)"

In determining the sufficiency of the evidence in a criminal case, appellate courts appraise the evidence, both direct and circumstantial, in the light most favorable to the prosecution, together with the reasonable inferences to be drawn therefrom, and will not weigh the evidence or test the credibility of the witnesses. *Havelock v. United States*, 427 F.2d 987 (10th Cir. 1970); *Glazerman v. United States*, 421 F.2d 547 (10th Cir. 1970), cert. denied, 398 U.S. 928, 90 S.Ct. 1817, 26 L.Ed.2d 90; *Bailey v. United States*, 410 F.2d 1209 (10th Cir. 1969), cert. denied, *Freeman v. United States*, 396 U.S. 933, 90 S.Ct. 276, 24 L.Ed.2d 232.

. . .

See also *United States v. Smith*, 521 F.2d 374 (10th Cir. 1975), and *United States v. Evans*, No. 76–1479, an unpublished Tenth Circuit decision filed June 9, 1977.

The evidence shows that in 1973 Wolf owned and controlled two corporations which were engaged in the manufacture of pallets in Oklahoma City, Oklahoma, and Dallas, Texas. In March of 1973, Wolf, on behalf of the two corporations, entered into

---

1. A pallet was described as a wooden platform device used by many manufacturers or warehouses in the movement of heavy or bulky material, usually with a mechanical fork lift.

agreements with Liberty-Heller Factors, Inc.[2] Liberty-Heller was engaged in a specialized method of financing wherein current accounts receivable were purchased from sellers of manufactured products. These purchases provided an immediate inflow of cash to the merchandiser. In substance, the contracts between Wolf and Liberty-Heller provided that upon assignment of accounts receivable to Liberty-Heller the Wolf corporations would be paid in cash ninety per cent of the face value of the account, less a three per cent service charge. The ten per cent retentions were to be held by Liberty-Heller to cover contingencies such as disputed claims. The Wolf customers were to receive invoices with printed endorsements thereon to the effect that such accounts had been assigned to Liberty-Heller and payments therefor were to be made directly to it. It was also understood that if payments were made to the Wolf corporations by any customer, such payments were to be delivered immediately to Liberty-Heller. There was evidence that early in the year 1974 Liberty-Heller's books indicated that many of the accounts which had been assigned to it were not being paid. An investigation developed through witnesses and an audit that in many instances assigned accounts had been paid directly to the Wolf corporations and retained by them. It was also found that in numerous instances there were assignments of invoices purporting to represent actual sales to customers which were fictitious. In March of 1974, these discrepancies totaled about $43,000, and by December, 1975, the total loss to Liberty-Heller was approximately $137,500.

With reference particularly to the first three counts of the indictment, it is argued that there is no evidence to show that Wolf intended to devise a scheme or artifice to defraud and that a fair interpretation of the record is that the so-called defalcations were not intentional, but only the result of bad judgment and overexpansion on the part of Wolf, together with pressure from Liberty-Heller. Each of the first three counts, however, charges that

Wolf obtained from Liberty-Heller cash advances on fictitious accounts receivable, or received and retained payment directly from the customer which belonged to Liberty-Heller. The defalcations extended over the period set forth in the indictment. Large sums of money were involved which would affect the financial condition of the two corporations controlled and managed by Wolf, and permits an inference that Wolf knew of them. *United States v. Curtis*, 537 F.2d 1091 (10th Cir.), cert. denied, 429 U.S. 962, 97 S.Ct. 389, 50 L.Ed.2d 330 (1976). The question of intent was one to be determined by the jury.

A scheme to defraud is an essential element of a violation of Section 1341, but statutory violation is not accomplished until there has been a use of the mails to further the scheme. *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944). Each use of the mails is a separate and distinct offense. *Marvin v. United States*, 279 F.2d 451 (10th Cir. 1960); *Palmer v. United States*, 229 F.2d 861 (10th Cir.), cert. denied, 350 U.S. 996, 76 S.Ct. 546, 100 L.Ed. 861 (1956). A person causes the use of mails where he does an act with knowledge that in the ordinary course of business the use of mails will follow. *United States v. Maze*, *supra*; *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *United States v. Pisciotta*, 469 F.2d 329 (10th Cir. 1972); *Marvin v. United States, supra.*

In Count 1, an invoice for goods purchased which had been assigned to Liberty-Heller was sent to Harter Concrete Products through the mails by a Wolf corporation, but the assignment was not indicated on the invoice and the amount due was paid to one of Wolf's corporations and retained by it. Counts 2 and 3 involve a sale of pallets to Horn Seed Company of Oklahoma City. The Oklahoma City Pallet Company mailed an invoice for the purchase to the seed company without indicating thereon that the account had been assigned to Liberty-Heller. Thereafter, the seed company

---

**2.** Liberty-Heller Factors, Inc. was a joint venture of the Liberty National Bank of Oklahoma City, Oklahoma, and Walter E. Heller Company of Chicago, Illinois.

mailed a check to the pallet company, which cashed the check and retained the money. These mailings were a natural and foreseeable result of the business transaction and played a significant part in Wolf's scheme to defraud and to obtain money to which he or his corporations were not entitled.

Counts 5 and 6 involve two invoices for the purported sales of heavy machinery by one of Wolf's corporations to Nor-Tex, Inc., a Dallas, Texas, corporation of which Wolf was an unknown part owner. The invoices representing these sales were in the sums of $8,640.00 and $7,940.00 when submitted to Liberty-Heller for assignment. The invoices were accepted and paid for. Pursuant to the practice then in effect, Liberty-Heller, after payment for the assignments, mailed them to Nor-Tex, which corporation received them through the mail in the regular course of business. Admittedly, these sales were not made and the delivery tickets submitted with the invoices were forged by Wolf. Wolf testified that these transactions were consummated with the consent and suggestion of Liberty-Heller. This was denied, which presented a factual question to be determined by the jury.

■ Relying on *United States v. Maze, supra,* and *Kann v. United States, supra,* it is contended that when the mailings were made by Liberty-Heller to Nor-Tex the fraudulent transaction was complete and the mailings thereafter were not in furtherance or in the execution of the scheme. We are constrained to agree. In the *Kann* case the scheme of the defendants was to obtain checks payable to them which were cashed at a bank, which then mailed them for collection to the drawee bank. The Court held that the scheme to receive money through the checks was complete when the checks were cashed by the schemers, and that the mailings by the bank which cashed checks were not for the purpose of executing the scheme. In *Maze* the defendant obtained goods and services through the

fraudulent use of a stolen credit card. The mailings relied upon to constitute a violation of the statute were the invoices for the food and services obtained by the user of the credit card. To overcome the argument that the fraudulent use of the credit card "caused" the use of the mails, the Court recognized that the evidence would support a finding that the mailings were caused by the fraudulent use of the credit card, but over vigorous dissent, held that the mailings which occurred after the fruition of the scheme could not be for its execution as required by the statute. Quoting from the *Kann* case, the Court said: "It cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires." See also *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960). In the instant case, Wolf submitted the fraudulent Nor-Tex invoices and had received payment therefor before copies of the invoices were mailed to Nor-Tex. We think the disposition of Counts 5 and 6 is controlled by *Kann* and *Maze.* Indeed, the government did not attempt to distinguish these cases in its brief, but contends that the facts bring the case within the "cause" provision of the statute. This argument was answered in the foregoing cases.

It is next urged that the cross-examination of Wolf relating to a former conviction of a felony exceeded permissible limits and was prejudicial. This subject has long been a sensitive area of the criminal law. Recognizing the prejudicial impact of such evidence upon the rights of an accused, as this court has heretofore noted, the trend of judicial thinking and court decisions has been to restrict its use. *United States v. Smith, supra;* *United States v. Williams,* 445 F.2d 421 (10th Cir.), cert. denied, 404 U.S. 966, 91 S.Ct. 342, 30 L.Ed.2d 286 (1971). See also *United States v. Martinez,* 555 F.2d 1273 (5th Cir. 1977). This trend culminated in the adoption of Rule 609 of the Federal Rules of Evidence.[3] See also Fed.Rules Evid. 404(b) and 103(c), 28 U.S.C.A.

---

**3.** Interest in this subject is illustrated by the action of Congress in rewriting Rule 609 as submitted to it by the Supreme Court of the United States. 4 U.S.Cong. & Adm.News 1974, pp. 7102, 7103. Rule 609(a) is as follows:

For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment

In the *Williams* case we elected to disregard the trend and to continue the time-honored rule that when a defendant in a criminal case takes the stand in his own defense, his credibility may be impeached and his testimony attacked in the same manner as any other witness, including reference to prior convictions. From the legislative history of Rule 609 it is quite evident that Congress was not willing to strictly limit evidence of prior conviction to those which involved dishonesty or false statements. It was also clear that the existing rule permitting the admission of all prior convictions of felonies when a defendant elected to testify in his own defense should be curtailed and subject to supervision by the trial court. Rule 609(a) as finally adopted by both houses of Congress provides that crimes punishable by death or imprisonment in excess of one year are admissible when the court determines that the probative value of such evidence outweighs the prejudicial effect to the defendant. The rule does not state how and when this determination should be made, but if it is to be effective the determination should be made before the time when any reference to the prior convictions is made in the presence of the jury. This question is not of concern here as the charge in the count of the indictment to which Wolf pleaded guilty involved dishonesty or false statement, which is admissible under the rule regardless of the punishment.

On direct examination Wolf testified that immediately prior to his entry into the pallet business in Oklahoma City he was engaged as plant manager and one-third owner in a business in Dallas, Texas, which manufactured air maintenance equipment for the United States Air Force in San Antonio, Texas. He stated that this operation failed and was duly adjudicated bankrupt. Wolf explained that sometime thereafter he and his two associates were charged in a ten count indictment with the crime of making false claims to the United States Government. The effect of additional testimony was to explain away his part in the making of these false claims and to deny his guilt. He testified that he could not afford to defend the charges and agreed to enter a plea of guilty to one count, with the understanding that the remaining counts were to be dismissed. He said that as a result of his plea of guilty pursuant to this arrangement, he was sentenced to two years' probation. On cross-examination the government attorney questioned Wolf as to the details of the count to which he had pleaded guilty and the remaining counts which were dismissed. Ordinarily, it is improper for the prosecution to examine into the details of the crime for which the accused was convicted. The cross-examination should be confined to a showing of the essential facts of convictions, the nature of the crimes, and the punishment. Care should be taken to protect the accused as far as possible from being convicted because of past conduct and not the crime for which he is being tried. *United States v. Martinez, supra*; *United States v. Harding*, 525 F.2d 84 (7th Cir. 1975); *United States v. Dow*, 457 F.2d 246 (7th Cir. 1972); *Tapia v. Rodriguez*, 446 F.2d 410 (10th Cir. 1971); *United States v. Mitchell*, 427 F.2d 644 (3d Cir. 1970); *Martin v. United States*, 404 F.2d 640 (10th Cir. 1968). A different situation is presented when an accused, on direct examination, attempts to explain away the effect of the conviction or to minimize his guilt. In such cases the defendant may be cross-examined on any facts which are relevant to the direct examination. *Martin v. United States, supra.* As was said in *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958), quoting from *Fitzpatrick v. United States*, 178 U.S. 304, 20 S.Ct. 944, 44 L.Ed. 1078 (1900): "[H]e has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts." The cross-examination was suffi-

in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

ciently relevant to the direct testimony of Wolf as to preclude any error.

 Following the cross-examination as to the admitted conviction, the prosecutor asked this question: "Have you ever been convicted of any other felony, other than the charge we just related out of the Northern District of Texas?" Over an objection, the answer was, "No." Following that response the prosecutor continued with the question, "You have not been convicted of any other crime?" Answer: "Not in ten years." It is this type of questioning that Rule 103(c) of the Federal Rules of Evidence was designed to prevent.[4] It provides:

> In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury.

Unless the prosecution is prepared to prove that there has been an undisclosed conviction which would be admissible under Rule 609, general questions of this nature should not be asked. *United States v. Pennix*, 313 F.2d 524 (4th Cir. 1963). We are satisfied, however, that on this record, together with the court's instruction on the subject, the asking of these questions would have had very slight, if any, effect upon the jury verdict, and therefore was not prejudicial. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *Rogers v. United States*, 411 F.2d 228 (10th Cir. 1969).

Conviction on Counts 1, 2 and 3 of the indictment is affirmed, and reversed as to Counts 5 and 6.

---

4. Advisory Committee notes to Rule 103(c) state: "This subdivision proceeds on the supposition that a ruling which excludes evidence in a jury case is likely to be a pointless procedure if the excluded evidence nevertheless comes to the attention of the jury."