**UNITED STATES of America**

v.

**Donald T. O'BRIEN and John J. Egan.**

**Crim. No. 80–00125–01.**

United States District Court,
E. D. Pennsylvania.

Oct. 21, 1980.

Donald A. Purdy, Asst. U. S. Atty., Peter F. Vaira, U. S. Atty., Philadelphia, Pa., for plaintiff.

John Rogers Carroll, Philadelphia, Pa., for Donald T. O'Brien.

Louis W. Fryman, Philadelphia, Pa., for John J. Egan.

---

## OPINION

JOSEPH S. LORD, III, Chief Judge.

### I. INTRODUCTION

The defendants are charged with thirty counts of mail fraud, 18 U.S.C. § 1341. They are accused of devising a scheme to defraud and to obtain money from numerous insurance companies by means of false representations, specifically failure to disclose fully the existence of other insurance coverage in their applications for policies and in claim forms submitted following an accident. The mailings on which the claimed violations of section 1341 are based are applications for policies, requests for claim forms, submission of claim forms and supporting documents, and causing the mailing of checks in payment of claims.

The defendants applied for numerous health and accident insurance policies between 1969 and 1975. In neither the applications nor in the later submitted claim forms did defendants fully disclose other insurance coverage which they then had, despite specific requests for that information in the forms. On July 2, 1975 both defendants were involved in a car accident and both suffered injuries requiring medical treatment including hospitalization. Defendants then submitted claim forms seeking payments under the policies. Though the indictment and the Government's case both implied that the accident might have been staged, the Government conceded it could not prove that it was not a legitimate accident or that the defendants' injuries were either non–existent or exaggerated.

There is no doubt that the defendants failed to disclose the existence of other insurance coverage in their applications for policies and in the claims forms. I hold, however, that as a matter of law, these non–disclosures do not constitute violations of 18 U.S.C. § 1341.

### II. THE MAIL FRAUD CHARGES

In this case, unlike most alleged mail fraud schemes, state law plays a decisive role in determining the existence *vel non* of a criminal scheme. The McCarran–Ferguson Act, 15 U.S.C. § 1011, states:

Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

The Act goes on to state:

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance ....

15 U.S.C. § 1012. The mail fraud act does not specifically refer to the business of insurance. Although the original version of the mail fraud act existed at the time Congress passed the McCarran–Ferguson Act, Congress did not exempt mail fraud from coverage.[1] The mail fraud act has since been amended but no specific mention of the insurance business was added to section 1341. *Cf. Spirt v. Teachers Insurance and Annuity Association*, 475 F.Supp. 1298 (S.D. N.Y.1979) (Title VII cannot override state regulation of the business of insurance absent explicit reference to insurance).

The Supreme Court has left no doubt that the Act contemplates state control over the connection between insurer and insured through the conduit of the insurance policy. In *SEC v. National Securities, Inc.*, 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668, 676 (1969), Mr. Justice Marshall said:

do apply to the insurance business but only to the extent that it is not regulated by state law. 15 U.S.C. § 1012(b).

---

1. Congress did partially exempt the Sherman, Clayton, and Federal Trade Commission Acts from the prohibition of § 1012(b). Those acts

The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the "business of insurance."

■ Pennsylvania has adopted a comprehensive and detailed code, the Insurance Company Law of 1921, 40 P.S.A. § 361 *et. seq.* Section 753(B) of that Act provides: [N]o ... policy delivered ... in this Commonwealth shall contain provisions respecting the matters set forth below unless such provisions are in the words in which the same appear in this section ... [or] different wording approved by the Commissioner which is not less favorable in any respect to the insured or the beneficiary.

Section 753(B)(4) sets forth the following approved provision:

Insurance with Other Insurers: If there be other valid coverage. not with this insurer, providing benefits for the same loss ... of which this insurer has not been given written notice prior to the occurrence or commencement of the loss, the only liability ... shall be for such proportion of the loss as the amount which would otherwise have been payable hereunder plus the total of the like amounts under all such other valid coverages for the same loss of which this insurer had notice bears to the total like amounts under all valid coverages for such loss, and for the return of such portion of the premiums paid as shall exceed the pro—rata portion for the amount so determined.

**2.** This is 40 P.S.A. § 753(B).

Thus, in Pennsylvania, when the existence of other insurance is not disclosed, the insurer's remedy is proration with the other companies involved, *if* the policy contains such a clause. And the Code leaves no doubt that this is the insurer's only remedy. Section 753(A) requires, *inter alia*, the inclusion of a policy clause providing that after three years from the date of issuance, no misstatements in an application, except fraudulent misstatements, shall be used to void the policy. The section also provides, however, that such "policy provision shall not be so construed ... to limit the application of section six hundred eighteen (B) ... (4) ... [2] in the event of misstatement with respect to ... other insurance." There can be no doubt, then, that under Pennsylvania law, the insurer has no choice but to pay the full amount of the claim unless the policy contained a proration clause, even in the face of non—disclosure of other insurance.

Government witnesses testified variously as to the importance of the non—disclosure. Some said they would not have issued the policy had the other insurance been revealed in the application. Others testified that they might not have paid the claim or would have investigated the accident more thoroughly if the other insurance had been disclosed in the claim forms.

■ First, the applications. The only charging counts in the indictment relating to the applications are counts 21 and 22, and they concern only defendant Egan. He has moved to dismiss those counts on the grounds that they are barred by the applicable five year statute of limitations. 18 U.S.C. § 3282. An essential element of this charge is a mailing. The only mailings relating to the applications were on November 5, 1974 and December 26, 1974. The indictment was returned April 1, 1980. While evidence of acts taking place more than five years before the indictment may be admissible to prove the existence of a scheme which continues into the five year period, *United States v. Gross*, 416 F.2d 1205, 1210 (8th Cir. 1969), *cert. denied*, 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427

(1970), it is clear that such acts alone cannot be the basis of a prosecution. 18 U.S.C. § 3281. I will therefore grant Egan's motion to dismiss counts 21 and 22.

Turning now to the non–disclosure in connection with the claims, the inescapable question is whether defendants' conduct comprised a scheme for obtaining money by means of false or fraudulent pretenses. I think it did not as a matter of law for two reasons, lack of materiality and legal impossibility.

Under Pennsylvania law, insurance companies are given the opportunity to prorate their liability when there is other undisclosed insurance if they include a clause to this effect in their policies. Misstatements as to other insurance are not grounds for cancellation. Rather, proration is the insurers' sole relief. However, none of the individual policy writers included the proportionate liability clause. There was, therefore, under the law, an obligation to pay the entire amount of the claim in ·spite of the non-disclosure. Since the insurers' liability was in no way affected by the failure to disclose, it cannot possibly be said that such failure was in any way material.

When the companies chose to write insurance in Pennsylvania, they chose concomitantly to be bound by the provisions of its laws. Having so chosen with knowledge of the law that bound them to pay the full amount of the claim and having rejected the option to prorate, there was at least an implicit promise to pay that full amount even though there was other undisclosed insurance. The failure to disclose was not material, and hence was legally insignificant.

There is a second defect in the claims forms mailing charges, legal impossibility. The essence of the charge is a scheme to defraud and to obtain money by false or fraudulent pretenses. To "[d]efraud is to deprive of some right, interest or property by deceit." *United States v. Godwin,* 566 F.2d 975, 976 (5th Cir. 1978). The defendants may have thought that they were obtaining money by deceit, but they were not. One cannot defraud another into paying money which that other person is obligated by law to pay. The insurance companies had no "right, interest or property" in the monies due defendants and they were deprived of nothing by deceit; rather, they were compelled to pay by operation of law.

In *United States v. Berrigan,* 482 F.2d 171 (3d Cir. 1973), Judge Aldisert said, at page 188:

Legal impossibility is said to occur where the intended acts, even if completed, would not amount to a crime. Thus, legal impossibility would apply to those circumstances where (1) the motive, desire and expectation is to perform an act in violation of the law; (2) there is intention to perform a physical act; (3) there is a performance of the intended physical act; and (4) the consequence resulting from the intended act does not amount to a crime.

Perhaps both the immateriality of the non–disclosures and the legal impossibility of defendants' acts being criminal is best illuminated by a question: what would the insurers have paid had disclosure been made? The answer: exactly · the same amounts. In short, there could have been no scheme to defraud the insurers of monies they were obligated to pay in any event. The crime which defendants may have intended to commit was legally impossible.

Finally, the Government contends that the insurers were defrauded of an incentive to investigate the accident more thoroughly and possibly reveal it as a sham. It is important to distinguish the two clauses of section 1341: (a) a "scheme or artifice to defraud"; (b) a scheme "for obtaining money or property by means of false or fraudulent pretenses." The indictment charges violations of both clauses in the conjunctive. In *United States v. Dixon,* 536 F.2d 1388 (2d Cir. 1976), Judge Friendly recognized this distinction and noted, at page 1398:

The mail fraud counts did not rely on the second clause of the mail fraud statute ... relating to any scheme or artifice "for obtaining money or property by means of false or fraudulent pretenses." Clearly Dixon did not do ·that; what he

obtained was an agency to vote. The Government's case on these counts thus must rest on showing sufficient evidence of a "scheme or artifice to defraud" *simpliciter.*

Conversely, in this case defendants are not charged with fraud *simpliciter.* The Government's case must therefore rest on showing sufficient evidence of a scheme for obtaining money by false pretenses. True, deceiving the insurers into making abbreviated investigations may be fraud, but that alone does not result in obtaining money, the charge in the indictment. Something additional is required–accidental injury. But as I have pointed out, under Pennsylvania law, the carriers would be fully liable if there were genuine accidental injuries. Thus, only if a more intensive investigation would have revealed a sham accident or injuries could the failure to disclose be part of a scheme to obtain money by means of false or fraudulent representations. The Government conceded that it could not prove fakery in the accident and, of course, a factfinder can not speculate that the accident and injuries were simulated. Discouragement of investigation because of non–disclosure is not enough to sustain the charge in the indictment. It must be transmuted into fraudulent obtaining of money by a staged accident which an investigation would have revealed. However, this has not been proven.

To summarize: the failure to disclose was not material, it could not result in a crime because of Pennsylvania law, and it could not result in the fraudulent receipt of money without an invented accident, which has not been shown. The defendants are therefore not guilty of mail fraud as a matter of law.[3]

### III.   THE INCOME TAX CHARGES

▮ The income tax charges (counts 31 and 32) are based upon the failure of defendant O'Brien to report as income the

money received from the policies. The proceeds from policies of the sort involved here are taxable only if the money was obtained illegally. *Rutkin v. United States,* 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833 (1952). Since I have concluded that these monies were not received illegally, it was no violation not to report them.

### IV.   CONCLUSION

The motions of the defendants for judgment of acquittal are Granted.

---

**3.**  I am aware of *United States v. Seasholtz,* 435 F.2d 4 (10th Cir. 1970). It is not discernible whether Kansas law has provisions similar to Pennsylvania law or that the McCarran Act was argued or considered. However, if the same arguments as to applicable state law were made, I disagree with *Seasholtz.*